J-S30032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHERIFF ALIMARR POTTER | : | |
| | : | |
| Appellant | : | No. 1031 EDA 2023 |

Appeal from the Judgment of Sentence Entered April 17, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003579-2021

BEFORE:   OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED NOVEMBER 5, 2025**

Appellant, Sheriff Alimarr Potter, appeals from the judgment of sentence imposed by the Court of Common Pleas of Delaware County, after a jury found him guilty of third-degree murder and possessing an instrument of crime (PIC).[1] He challenges the sufficiency of evidence, arguing that the Commonwealth failed to establish provocation to support the jury's finding of malice. Upon review, we affirm.

The evidence at trial established that, on July 8, 2021, at around 5 p.m., Police Officer Michael Smalarz was patrolling Chester, Pennsylvania, when he received a radio dispatch for a vehicle accident at 16th Street and Edgmont

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c) and 907(a), respectively.

Avenue.[2] **See** N.T. Trial, 2/8/23, 42, 47. Officer Smalarz was a couple of blocks away and arrived about a minute later. **See id.** at 48. The vehicle involved in the accident at that location was a Dodge Charger with severe front damage. **See id.** at 49-50. Inside the car was a person, identified as Kevin Canty, in the driver's seat. **See id.** Officer Smalarz noted that blood covered the center console of the vehicle, and there was money in the passenger seat. **See id.** at 51.[3] The blood appeared to be coming from Canty's lower body, specifically his left leg. **See id.** at 57, 72. The fire department attempted to save Canty, who was unresponsive. **See id.** at 52. Unfortunately, Canty was pronounced deceased at the scene. **See id.** at 53.

Khalil Wardak, M.D., an assistant medical examiner, testified that he conducted Canty's medical examination following his death. **See** N.T. Trial, 2/8/23, 106; Commonwealth Trial Exhibit C-100A (Autopsy Report). Doctor Wardak determined that Canty died because of multiple stab wounds, inflicted with a knife, specifically to the left thigh and ankle. **See id.** at 109. Both wounds severed Canty's femoral artery, a principal blood vessel supplying the lower extremities, causing rapid and fatal blood loss. **See id.** at 110.

Doctor Wardak further testified that, after sustaining these injuries, Canty would have been able to leave the initial scene and drive away, but

_____

[2] Appellant refers to Edgmont Avenue as "Edgemont Avenue" in his brief. **See, e.g.,** Appellant's Brief, 5.

[3] No weapons were found in the vehicle or in Canty's possession. **See** N.T. Trial, 2/8/23, 53, 97.

would have soon lost consciousness, which likely caused him to crash the car. *See* N.T. Trial, 2/8/23, 112. Canty was pronounced dead at the scene of the accident. *See id.* Doctor Wardak explained that a human body's physiological response to the trauma and Canty's rapid blood loss would have made death inevitable in minutes. *See id.* at 112-13. Further, Dr. Wardak's examination of Canty revealed additional injuries sustained in the motor vehicle accident; however, these injuries were not fatal and did not contribute to Canty's death. *See id.* at 116-18.

The video surveillance established that, prior to Canty's death, he was parked in his Dodge Charger on Edgmont Avenue at 4:38 p.m. *See* N.T. Trial, 2/8/23, 85, 93-94; Commonwealth Trial Exhibit C-154A (Video Surveillance), 4:38:16. Before Canty arrived, an individual operating a white truck had parked at the corner west of 21st Street. *See* N.T. Trial, 2/8/23, 83; Commonwealth Trial Exhibit C-154A, 4:31:50. The individual in the white truck was later identified as Keith Williams, who subsequently testified at trial. *See* N.T. Trial, 2/8/23, 155. Williams stated he was waiting for a man known as "R", whom he later identified as Appellant, for the purpose of purchasing crack cocaine.[4] *See id.* at 266, 303. Around the same time, Alvin Smith, an acquaintance of Canty, was walking to a deli market on Edgmont Avenue. *See*

_____

[4] Additionally, Christa Schlupp testified that she knew Appellant and identified him as the individual in the surveillance video footage. *See* N.T. Trial, 2/9/23, 8.

*id.* at 144, 148. Smith, who had previously sold crack cocaine to Williams, approached Williams' white truck to inquire about his presence. *See id*. at 153-55.

Williams informed Smith that he was waiting for Appellant and asked whether Smith had any crack cocaine. *See id*. at 155, 268. Smith responded that he did not and offered to ask other people. *See id.* at 157. Smith entered the deli market and was advised that Canty was in possession of crack cocaine. *See* N.T. Trial, 2/8/23, 163. At 4:47 p.m., Smith approached Canty, who remained seated in his Dodge Charger. *See id.* at 164; Commonwealth Trial Exhibit C-154C (Video Surveillance Camera 4), 4:47:44. Smith testified that Canty was hesitant but agreed to sell Williams crack cocaine. *See* N.T. Trial, 2/8/23, 165-66. Then, Smith and Canty proceeded to Williams' vehicle, where Williams remained seated. *See id.* at 167; Commonwealth Trial Exhibit C-154C, 4:48:58.

Williams testified that he produced forty dollars to complete the transaction with Canty, who was holding the crack cocaine. *See* N.T. Trial, 2/8/23, 274. As the hand-to-hand exchange was about to occur, Appellant abruptly approached and seized Canty's hand containing the money. *See id.* at 275. Appellant began ranting at Canty, stating, "what the fuck are you doing?" and "this is my shit." *Id.* at 198-99. As a result, Canty ceased the transaction with Williams. *See id.* at 276. Appellant then reached through the window of Williams' truck, took the forty dollars, and delivered his own crack cocaine to Williams. *See id.* Williams then departed the scene in his truck,

testifying that he was nervous and that the encounter between Canty and Appellant felt elevated. *See id.* at 290.

Smith told Canty to walk away from Appellant with him, and the two began to leave together. *See* N.T. Trial, 2/8/23, 205. However, Canty turned around and walked back in the direction of Appellant. *See id.* at 206; Commonwealth Trial Exhibit C-154C, 4:48:58. Smith testified that he walked off and last saw Canty and Appellant, "face to face." N.T. Trial, 2/8/23, 208. Video footage showed that Appellant and Canty disappeared momentarily behind a bush. *See* N.T. Trial, 2/9/23, 89-90; Commonwealth Trial Exhibit C-154C, 4:49:31. A zoomed-in portion of the video showed a blurred Canty, identifiable in a white shirt, making two quick backward movements. *See* N.T. Trial, 2/9/23, 115-16, 119-20; Commonwealth Trial Exhibit 155 (Compilation Video), 18:41.[5] Afterwards, the video footage showed Canty running back to his Dodge Charger on Edgmont Avenue, with blood visible on his left shoe. *See* N.T. Trial, 2/8/23, 71; Commonwealth Trial Exhibit C-154C, 4:50:31. Canty drives off quickly, crashing minutes later. *See* N.T. Trial, 2/9/23, 116; Commonwealth Trial Exhibit C-154C, 4:50:43.

Around 5 p.m., Detective William Swanson was called into work and directed to report to Canty's vehicle crash on 16th Street and Edgmont Avenue. *See* N.T. Trial, 2/9/23, 18. However, he was directed to 21st Street and

---

[5] The compilation video does not indicate the time stamp of the actual surveillance cameras.

Edgmont Avenue to look for a crime scene connected to the crash. *See id.* at 18-19. Surveying the area, he found a trail of blood along the sidewalk at the west corner of 21st Street. *See id.* at 20. Detective Swanson discovered that the blood ended where Canty's car was originally parked on Edgmont Avenue. *See id.* at 40.

Detective Daniel Farland testified that, at the scene of Canty's vehicle crash, he was notified there might be another potential crime scene at 21st and Edgmont Avenue. *See* N.T. Trial, 2/9/23, 72. Detective Farland, familiar with the area, knew there were video cameras on Edgmont Avenue. *See id.* at 75. The investigation of the video footage led to Williams and Smith being interviewed, who made recorded statements that were also introduced at trial. *See* N.T. Trial, 2/9/23, 126-128; Commonwealth Trial Exhibits 146 (Smith Recorded Statement, 7/8/21) and 147 (Williams Recorded Statement, 7/13/21).

Ultimately, on July 28, 2021, after gathering evidence and getting an arrest warrant for Appellant, police officers found him, with canine assistance, hiding in the ceiling of his house. *See* N.T. Trial, 2/9/23, 171-72. At closing argument, Appellant's trial counsel only argued that the Commonwealth did not prove Appellant was the one who killed Canty. *See id.* 188-96. At the end of the three-day trial, the jury found Appellant guilty of third-degree murder and PIC. *See id.* at 288; Jury Verdict, 2/9/2023. The trial court sentenced him to consecutive imprisonment terms of 20 to 40 years for third-degree murder and 20 to 42 months for PIC. *See* Order (Sentencing), 4/17/2023.

On April 18, 2023, Appellant timely filed a *pro se* notice of appeal. **See** Notice of Appeal, 4/18/2023. The trial court permitted his trial counsel to withdraw from representation and appointed appellate counsel. **See** Order, 7/7/2023. Then, on January 22, 2024, the trial court issued an order for Appellant to file a statement of errors complained on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), which appellate counsel filed on February 8, 2024. **See** Pa.R.A.P. 1925(b); Order, 1/22/2024; Statement of Errors Complained on Appeal, 2/8/2024. Afterwards, Appellant filed a *pro se* motion for a **Grazier** hearing, asking that his appellate counsel withdraw.[6] **See** Motion for Grazier Hearing, 2/11/2024. On July 25, 2024, at the hearing, Appellant withdrew his request to remove counsel. **See** Order, 7/25/2024. On December 20, 2024, the trial court filed its Rule 1925(a) opinion. **See** Trial Court Opinion, 12/20/2024.

Appellant presents one question for our review:

Was the conviction of the crime of [t]hird[-d]egree [m]urder based upon insufficient evidence, where the evidence introduced at trial failed to prove beyond a reasonable doubt that [Appellant] acted with requisite malice?

Appellant's Brief, 4.

Appellant challenges the sufficiency of evidence supporting his third-degree murder conviction. **See** Appellant's Brief, 15. A challenge to the sufficiency of evidence presents "a question of law, for which our standard of

_____

[6] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

review is *de novo* and our scope of review is plenary." ***Commonwealth v. Packer***, 168 A.3d 161, 166 (Pa. 2017). Our standard of review is as follows:

> When reviewing challenges to the sufficiency of the evidence, we evaluate the record in the light most favorable to the Commonwealth as the verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. However, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by means of wholly circumstantial evidence. Moreover, this Court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed. Lastly, we note that the finder of fact is free to believe some, all, or none of the evidence presented.

***Commonwealth v. Ewida,*** 333 A.3d 1269, 1279 (Pa. Super. 2025) (citation omitted).

"[T]hird-degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." ***Commonwealth v. Thompson***, 106 A.3d 742, 759 (Pa. Super. 2014) (citation omitted); 18 Pa.C.S. § 2502(c). To sustain a third-degree murder conviction, the Commonwealth must demonstrate that the defendant caused the death of another individual with malice. ***See Commonwealth v. Knox,*** 219 A.3d 186, 195 (Pa. Super. 2019) (citation omitted). "Malice includes not only particular ill will toward the victim, but also wickedness of disposition, hardness of heart, wantonness, and cruelty, recklessness of consequences, and conscious disregard by the defendant of an unjustified and extremely high risk that his actions may cause serious

bodily harm." ***Commonwealth v. Jones***, 271 A.3d 452, 458 (Pa. Super. 2021). "[M]alice may be inferred from the use of a deadly weapon on a vital part of the victim's body." ***Commonwealth v. Vansyckel***, 341 A.3d 174, 180 (Pa. Super. 2025) (*en banc*) (quoting ***Commonwealth v. Ventura,*** 975 A.2d 1128, 1142 (Pa. Super. 2009)).

Appellant contends that the evidence presented at trial was insufficient to support a conviction for third-degree murder because the Commonwealth did not establish the element of malice. ***See*** Appellant's Brief, 15. While Pennsylvania law allows malice to be inferred when a deadly weapon is used on a vital part of the body, ***see Commonwealth v. Gonzales***, 609 A.2d 1368, (Pa. Super. 1992), Appellant argues "such use of a weapon cannot support a finding of malice in the presence of evidence negating malice." Appellant's Brief, 15. In relying on ***Commonwealth v. Caye***, 348 A.2d 136, 137 (Pa. 1975), Appellant points out that the inference of malice can be rebutted by direct evidence demonstrating an absence of malice, even where a deadly weapon is used on a vital part of the body. ***See*** Appellant's Brief, 19-20.

In his case, Appellant argues that the video evidence and witness testimony showed that Canty was the initial aggressor and provoked the confrontation with Appellant. ***See*** Appellant's Brief, 21. He points to the video footage, which shows Canty, who was larger than Appellant, turning and advancing toward Appellant just before the confrontation, although the actual altercation is obscured by a bush. ***See id.*** Additionally, he argues that Smith's

testimony recounted that Canty and Appellant were "face to face" and yelling threats at one another. *See id.* This, Appellant asserts, negates the inference of malice, citing **Commonwealth v. Hetherington**, 385 A.2d 338, 341 (Pa. 1978), which recognizes that provocation or evidence of self-defense can defeat the malice requirement. *See* Appellant's Brief, at 20-22. Therefore, Appellant concludes that the inference of malice is negated by Canty's provocation. *See id.* at 22.

The Commonwealth argues that Appellant is precluded from raising, for the first time on appeal, the theory that provocation negated malice and would support a voluntary manslaughter charge. *See* Commonwealth's Brief, 6. It contends that Appellant's theory was not argued or preserved at trial; therefore, under Pennsylvania Rule of Appellate Procedure 302(a) and **Commonwealth v. Truong**, 36 A.3d 592, 598-99 (Pa. Super. 2012) (*en banc*), it is waived and is not properly before our Court. *See* Commonwealth's Brief, 6. Further, the Commonwealth maintains that its burden to disprove provocation arises only when the issue has been raised at trial, which did not occur in this case. *See* Commonwealth's Brief, 7. Moreover, the Commonwealth argues that even if Appellant requested a voluntary manslaughter instruction, such an instruction was unwarranted because Appellant's defense rested on denying involvement in the killing, not on a heat of passion or unreasonable self-defense argument. *See id*. In relying on **Commonwealth v. Sanchez**, 82 A.3d 943, 980 (Pa. 2013), the Commonwealth asserts that a voluntary manslaughter instruction is not

appropriate where the defendant denies having committed the act resulting in the death. **See** Commonwealth's Brief, 7. Alternatively, the Commonwealth argues that there was sufficient evidence to support the jury's finding that Appellant was guilty of third-degree murder and that he acted with the requisite malice in killing Canty. **See id.** at 8.

Appellant disputes the Commonwealth's assertion that his claim is waived. **See generally** Appellant's Reply Brief. Appellant argues that he does not challenge the lack of a voluntary manslaughter instruction; rather, he asserts that the prosecution failed to prove malice beyond a reasonable doubt. **See id.** at 3. However, Appellant argues that the Commonwealth's evidence establishing provocation can lead to a dismissal of third-degree murder conviction. **See** Appellant's Reply Brief, 5.

Appellant's argument is incorrect because he did not request a voluntary manslaughter instruction at trial. **See id.** at 3. Additionally, because his trial counsel maintained that he was not involved in the murder, we agree with the Commonwealth that such an instruction is waived, and in any event, was unwarranted. **See Commonwealth v. Proctor,** 156 A.3d 261, 270 (Pa. Super. 2017) (requiring specific timely objection to preserve challenge to jury instructions); **see also Sanchez,** 82 A.3d at 980 ("[The Pennsylvania Supreme] Court has long held that no jury charge is required on the elements of voluntary manslaughter where the defendant denies having committed the killing."). Upon review of the record, we agree that Appellant failed to raise the legal theory of provocation at trial, thereby waiving his provocation claim.

*See Truong,* 35 A.3d at 599 ("New theories cannot be raised on appeal.");

Pa.R.A.P. 302(a).[7] Although Appellant frames his sufficiency claim in terms of

an unpreserved legal theory, we will construe his argument liberally as a

challenge to the Commonwealth's proof of malice.[8]

To the extent that Appellant argues the Commonwealth failed to prove

malice beyond a reasonable doubt, we find no merit to that claim. Indeed,

Appellant's reliance on **Caye** is misplaced. In **Caye**, our Supreme Court found

the evidence insufficient to support a finding of malice necessary for second-

degree murder, where the defendant, believing the victim to be an intruder in

_____

[7] Appellant's brief also provides no citation to the record in support of his provocation claim, in violation of Pennsylvania Rule of Appellate Procedure 2119(c). **See** Appellant's Brief, 21-22.

[8] Even if, we considered Appellant's provocation argument, the record is devoid of any evidence that would elevate the disagreement between Appellant and Canty to the level of adequate provocation. "The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection." **Commonwealth v. Miller**, 987 A.2d 638, 650 (Pa. 2009). Appellant's confrontation with Canty arose from a dispute over a drug sale. The Commonwealth provided witness testimony establishing that Appellant and Canty engaged in a verbal altercation and were observed to be "face-to-face". It's well-settled Pennsylvania law that mere words or an argument do not rise to the level of legal provocation. **See Commonwealth v. Cisneros**, 113 A.2d 293, 296 (Pa. 1955) (holding that "[t]he law of Pennsylvania is clear that no words of provocation, reproach, abuse or slight assault are sufficient to free the party from guilt of murder") (emphasis omitted); **see also Commonwealth v. Walters**, 244 A.2d 757, 762 (Pa. 1968) (arguing and use of harsh language insufficient to show passion or lack of cooling: "The mere fact that he had been arguing with the deceased and that she had cursed at him, will not, by itself, be sufficient to show that passion motivated the crime, or that there was no time to cool."). Appellant's waived self-defense argument has no merit.

a recently burglarized rural home, shot and killed the victim. *See Caye,* 348 A.2d at 138-39 (holding Commonwealth's direct evidence only supported voluntary manslaughter and not third-degree murder). Unlike *Caye*, there is no evidence of Appellant's fear of Canty or a mistaken resort to self-defense; rather, the jury inferred from the totality of the circumstances that Appellant killed Canty with malice. *See Thompson*, 106 A.3d at 757 ("Malice may be inferred by considering the totality of the circumstances") (citation omitted).

Under the appropriate standard of review, viewing the evidence in the light most favorable to the Commonwealth, as the verdict winner, we conclude there was sufficient evidence to warrant the jury's conviction for third-degree murder. The evidence established that Appellant inserted himself into a drug transaction between Canty and Williams. The jury could infer malice not from the drug transaction but from Appellant's subsequent conduct: his decision to grab Canty's hand in Williams' car window, interfere with Canty's transaction, and engage in a violent encounter, stabbing Canty two times and leaving him bleeding and fleeing. There was no evidence to suggest that Canty possessed any weapons on his person or initiated an attack on Appellant. The Commonwealth further demonstrated with video footage that Appellant was the only one with Canty behind the bush before he ran to his vehicle. *See* Commonwealth Trial Exhibit C-155, 18:41. The totality of these circumstances amply supported the finding of malice. Additionally, Appellant hid from law enforcement in his house ceiling, further indicating a consciousness of guilt. *See Commonwealth v. Harvey*, 526 A.2d 330, 334 (Pa. Super. 1987)

(affirming that hiding from law enforcement may be considered evidence of guilt). Accordingly, Appellant's claim is without merit.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/5/2025